IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| AMANDA BIELEFELDT *ex rel.* ) <br> HAILEY D. WHEELOCK ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MICHAEL J. ASTRUE, ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) | Case No. 09 C 50302 <br><br> Magistrate Judge P. Michael <br> Mahoney |

**MEMORANDUM OPINION AND ORDER**

**I.     Introduction**

Amanda Bielefeldt, on behalf of her minor child, Hailey D. Wheelock, seeks judicial review of the Social Security Administration ("SSA") Commissioner's decision to deny her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.[1] *See* 42 U.S.C. §§ 1383(c)(3), 1381a. This matter is before the Magistrate Judge pursuant to the consent of both parties, filed on March 23, 2010. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

**II.    Administrative Proceedings**

Hailey D. Wheelock ("Claimant") applied for SSI on June 17, 2008, alleging a disability onset date of May 1, 2008. (Tr. 96.) Claimant's initial application was denied on July 9, 2008. (Tr. 50.) Upon reconsideration, her claim was again denied on October 2, 2008. (Tr. 57.) Claimant filed a request for a hearing before an Administrative Law Judge ("ALJ") on October 8, 2008. (Tr. 63.) The hearing took place before ALJ Maren Dougherty on July 1, 2009. (Tr. 18-47.) Claimant and her mother appeared via videoconference, and her mother testified, with

---

[1] The ALJ rendered the decision under a Title XVI supplemental security income analysis. (Tr. 6.)

1

Claimant's attorney present. (Tr. 20, 18-47.)

On August 5, 2009, the ALJ held that Claimant was not disabled and denied her claim for SSI. (Tr. 6-17.) Claimant requested review of the ALJ decision, and the Appeals Council denied Claimant's request on October 27, 2009. (Tr. 1.) As a result of this denial, the decision of the ALJ is considered the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1455, 416.1481, *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Claimant has filed a complaint in the United States District Court for the Northern District of Illinois, Western Division, seeking judicial review under 42 U.S.C. §§ 405(g), 1383(c)(3).

## III.    Background and Medical History

Claimant was born on June 23, 2006. (Tr. 136.) She was approximately 23 months old when the application for SSI was filed, and approximately three years old at the time of the ALJ hearing. (Tr. 8, 30.) Thus, Claimant was an older infant/toddler at time of filing and a preschool child at the time of hearing under 20 C.F.R. § 416.926a(g)(2).

At the ALJ hearing, Claimant's mother stated that Claimant suffered from developmental delays and discussed at length the practical implications stemming from these delays, including communicative, motor, and cognitive issues (Tr. 32-47.) Claimant's mother also discussed Claimant's history of medical issues, focusing particularly on Claimant's ear infections and febrile seizures. *Id.*

Claimant has suffered from otitis media,[2] and has seen a doctor complaining of symptoms related to otitis media on no fewer than eight occasions. The treatments recommended and prescribed by doctors have generally included antibiotics and over-the-counter pain relievers. For example, Claimant visited the emergency room on August 1, 2007, where Dr.

---

[2]  Otitis media is known in layman's terms as a middle ear infection. Ear Infections, National Institutes of Health (July 1, 2011), http://www.nlm.nih.gov/medlineplus/earinfections.html.

Thanh Andreakos diagnosed her with an ear infection and prescribed antibiotics for treatment, in addition to recommending Tylenol and Motrin to relieve related pain and reduce fever. (Tr. 190, 191.) On another occasion, Claimant visited the emergency room on June 10, 2008 due to fever and ear pain, and Dr. Abbas Al-Saraf prescribed her antibiotics and ibuprofen. (Tr. 290, 291.) Claimant has been treated surgically for her chronic otitis media, having a bilateral tympanostomy with vents[3] completed on February 8, 2008. (Tr. 174.) Claimaint has had fewer reported incidents of otitis media after the procedure. Claimant has also contracted and been treated for other viral and bacterial infections, such as the upper respiratory infection diagnosed by Kelly Lovejoy on July 9, 2006 (Tr. 202.)

Claimant has a history of fevers and suffering from febrile seizures.[4] Claimant has visited the doctor and recorded a fever on more than fifteen documented occasions, but has never stayed overnight in the hospital for treatment of these symptoms. (Tr. 323.) For example, Claimant went to the emergency room on April 15, 2008 and was seen by Dr. Brian Jokhy, who noted a fever of 101.3 degrees Fahrenheit. (Tr. 209, 210.) According to the medical records, Claimant's febrile seizures have never been witnessed by a treating source, but records indicate approximately ten such seizures between 11 months and 2 years of age. (Tr. 357.) Treatment has routinely included and been limited to over-the-counter pain relievers, such as Motrin and Tylenol, and antihistamines, such as Benadryl, except where onset of otitis media required antibiotics. Exemplifying this pattern is Claimant's January 9, 2008 emergency room visit, where Dr. George Beranek diagnosed her with febrile seizure, fever, and otitis media, and recommended Tylenol and ibuprofen to address the fever while prescribing amoxicillin to treat

---

[3] A bilateral tympanostomy with vents involves placing ventilation tubes in both ears and is a common outpatient procedure for young children who suffer from repeated ear infections. *See* Ear tube insertion, National Institutes of Health (June 22, 2011), http://www.nlm.nih.gov/medlineplus/ency/article/003015.htm.
[4] Febrile seizures are convulsions that are brought on by a fever in infants or young children. *See* NINDS Febrile Seizures Information Page, National Institutes of Health (June 28, 2011), http://www.ninds.nih.gov/disorders/febrile_seizures/febrile_seizures.htm.

the otitis media. (Tr. 226.) Since March 2008, the frequency of reported incidents of febrile seizure has decreased and Claimant is experiencing them less often as she grows older. (Tr. 312.) No evidence of any residual physiological deficits have been found to result from the seizures. (Tr. 312.) Chest x-rays have returned normal. (Tr. 184, 186, 205, 247.) Medical imaging of the brain – including MRIs, CT scans, and EEGs – have likewise been found unremarkable. (Tr. 185, 227, 229, 250, 316.) Hearing tests have come back normal. (Tr. 346.)

Most significant to the ALJ's decision, numerous doctors and other treating sources have tested Claimant for developmental delays. On September 6, 2007, Dr. Phillip Miner, M.D., conducted a neurological assessment of Claimant (Tr. 250-254.) Dr. Miner performed a thorough battery of tests, including an MRI and EEG of Claimant's brain, blood tests, and urinalysis, and came to a conclusion of "mild motor delay." (Tr. 253.) Kendra Meyers, MPT, of Rockford Health System observed Claimant on June 16, 2008 and likewise noted "mild delays in overall gross motor development" based on test scores indicating motor delay of 22%. (Tr. 298.) On July 15, 2008, the Illinois Early Intervention program evaluated Claimant using the Battelle Developmental Inventory and Bayley Scales of Infant Development III, and reported motor, communicative, and adaptive developmental delays of approximately 22%, as well as a cognitive delay of 37%. (Tr. 263, 319.) Regarding the cognitive delay, the Early Intervention evaluator noted that "[e]xperience is a possible factor related to non-completion of many test items." (Tr. 321.) Mark Langgut, Ph.D. and licensed clinical psychologist, tested Claimant on September 12, 2008 using the Bayley Scales of Infant Development III and concluded her cognitive development was in the 16th percentile, language development was in the 8th percentile, and motor development was in the 1st percentile. (Tr. 323, 324.) The test administrator notes that Claimant "was only fairly cooperative during the examination as she was somewhat tired and irritable." (Tr. 323.) On May 19, 2009, Rockford Public Schools

4

Individualized Education Program ("IEP") assessed Claimant's development progress. (Tr. 354-379.) Testers used the Peabody Developmental Motor Scales Assessment and concluded she had average grasping skills and below average visual-motor integration. (Tr. 358.) The IEP concluded that Claimant had impairments in articulation and expressive, receptive, and pragmatic language, as well as noting delays of 25% but less than 30% for physical, cognitive, and communication development. (Tr. 359, 360.)

Dr. Cosme Cagas, M.D., a state agency reviewing physician, reviewed the Claimant's medical records on July 1, 2008 and opined that she was severely impaired due to her history of febrile seizures, but that the impairment did not meet, medically equal, or functionally equal the listings. (Tr. 309.) Specifically, Dr. Cagas found that there were no limitations in the first five domains and a "marked" limitation in the sixth domain, health and physical well-being. (Tr. 311, 312.) In support of the finding on domain six, Dr. Cagas noted that Claimant is having fewer febrile seizures as she gets older and has had no lasting effects from the seizures. (Tr. 312.)

On September 30, 2008 and October 1, 2008, Dr. Victoria Dow, M.D., and Donna Hudspeth, Psy.D., reevaluated Claimant on behalf of the SSA. (Tr. 325-330.) This assessment specifically noted the developmental delays as a recognized impairment, but came to the same conclusion as Dr. Cagas: that the impairment did not meet, medically equal, or functionally equal the listings. (Tr. 325.) The evaluators found that Claimant had "less than marked" limitation in five of six domains and no limitation in domain three, interacting and relating with others. (Tr. 327, 328.) In particular, the evaluators considered the scores from Claimant's testing on Bayley Scales of Infant Development III as completed by Mark Langgut, Ph.D., and noted that Claimant can follow most simple one- and two-step directions in determining a "less than marked" limitation in domain one, acquiring and using information. (Tr. 327.) Evaluators also determined that there were no behavioral abnormalities based on the record, only that Claimant

was overactive, in deciding a "less than marked" limitation in domain two, attending and completing tasks. (Tr. 327.)

IV.     **Standard of Review**

The court may affirm, modify or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* However, the court conducts a critical review of the evidence when evaluating the ALJ's decision. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

The court will reverse or remand an ALJ's denial of benefits only if the decision is not supported by substantial evidence or based on an error of law. 42 U.S.C § 405(g); *see also Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

V.      **Framework of Decision**

A person under the age of 18 is "disabled" if she does not engage in substantial gainful employment and "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable

6

clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

The Commissioner proceeds through three steps in determining whether a claimant under the age of 18 is disabled. *See* 20 C.F.R. § 416.924(a)–(d). The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; and (3) whether the impairment meets, medically equals, or functionally equals the listings. 20 C.F.R. §§ 416.924(b)–(d), 416.926a. To determine whether the impairment functionally equals the listings, the Commissioner first considers how the child functions as a whole; this consists of looking at all of the child's activities, which include everything the child does at home, at school, and in her community, and evaluating how the child is limited or restricted in those activities, without cabining the child's impairments into any particular domain. 20 C.F.R. § 416.926a(b)-(c); *see* SSR 09-1p. After determining the activities in which the child is limited, the Commissioner considers which of the following six domains are involved in those activities: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for his or herself; and (vi) health and physical well–being. 20 C.F.R. § 416.926a(b)(1). A child must have "marked" limitations in at least two of the domains, or an "extreme" limitation in one domain, to have an impairment that functionally equals the listings. 20 C.F.R. § 416.926a(a). The Court analyzes each step in the framework to determine whether the Commissioner's decision was supported by substantial evidence.

## VI. Analysis

### A. Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?

7

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 416.910. If the claimant is engaged in substantial gainful activity, he or she is found not to be disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Here, the ALJ determined that Claimant has not engaged in substantial gainful activity at any time relevant to the decision. (Tr. 9.) Neither party disputes this finding. As such, the ALJ's Step One determination is affirmed.

B. **Step Two: Does the Claimant Suffer From a Severe Impairment?**

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which is more than a slight abnormality or combination of slight abnormalities, and that causes more than minimal functional limitations. 20 C.F.R. § 416.924(c). If the claimant suffers a severe impairment, then the inquiry moves to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

Here, the ALJ determined that Claimant has severe impairments from her history of febrile seizures, recurrent viral and bacterial infections, and developmental delays. (Tr. 9.) Neither party disputes this finding; thus, the ALJ's Step Two determination is affirmed.

C. **Step Three: Does Claimant's Impairment Meet, Medically Equal, or Functionally Equal an Impairment in the Commissioner's Listing of Impairments?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. § 416.925(a).

To determine whether an impairment functionally equals a listing, the Commissioner considers the child's limitations across six domains: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for his or herself; and (vi) health and physical well–being. 20 C.F.R. § 416.926a(b)(1). A child must have marked limitations in two of the domains, or an extreme limitation in one domain, to have an impairment that functionally equals the listings. 20 C.F.R. § 416.926a(a).

A "marked" limitation is one where the impairment interferes with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). A "marked" limitation is also characterized as "more than moderate" but "less than extreme." *Id*. The regulations further state that a child has a "marked" limitation if she has a "valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and [the child's] day to day functioning in domain–related activities is consistent with that score." *Id*. If a child has not yet attained the age of 3, she will be found to have a "marked" limitation if she functions at a level that is "more than one-half but not more than two-thirds of her chronological age"; this test applies only when there are no standard scores from standardized tests in the record. *Id*.

An "extreme" limitation is one where the impairment very seriously interferes with the child's "ability to independently initiate, sustain, or complete activities" in a domain. 20 C.F.R. § 416.926a(e)(3). An "extreme" limitation is "more than marked." *Id*. A child has an "extreme" limitation if he or she tests at least three standard deviations below the mean on a standardized test designed to measure ability or functioning in a domain. *Id*. Alternatively, for a child who has not yet reached age 3, she will be found to have an "extreme" limitation if she functions at a

9

level that is "one-half of her chronological age or less"; this test is applicable only when there are no standard scores from standardized tests in the record. *Id.*

Here, the ALJ determined that Claimant did not meet, medically equal, or functionally equal the listings. (Tr. 10-17.) In considering Claimant's history of febrile seizures, the ALJ noted that the lack of documented seizures during nonfebrile periods and the relative infrequency of the seizures failed to meet or medically equal the listing requirements. (Tr. 11.) Neither party disputes the ALJ's finding that Claimant does not meet or medically equal the listings; thus, the ALJ's determination in that regard is affirmed.

The ALJ considered the totality of the evidence in concluding that Claimant had a "marked" limitation in only one domain, "health and physical well-being." The ALJ noted the significant number of doctor and hospital visits for a variety of symptoms, along with the history of recurrent upper respiratory infections, in determining that Claimant suffers a "marked" limitation in domain six. (Tr. 17.) Nothing in the opinion indicates that the ALJ failed to consider this limitation, or the impairments resulting in the finding of this limitation, in analyzing Claimant's limitations in the other domains. *See* SSR 09-8p.

The ALJ did not find a "marked" or "extreme" limitation in any of the other five domains. This finding is supported by "substantial evidence" in the record. Claimant challenges the ALJ's finding that Claimant lacks "marked" limitations in domains one or two. However, tests conducted by Dr. Miner, Mark Langgut, and the IEP failed to find delays rising to the level of a "marked" limitation. Likewise, state agency reviewer assessments by Dr. Cagas, Dr. Dow, and Donna Hudspeth also concluded Claimant's limitations in domains one and two were less than "marked" in degree. The ALJ considered the test by Illinois Early Intervention that found a 37% cognitive delay, but found that this evidence did not outweigh the aforementioned tests. Specifically, the ALJ noted that the Illinois Early Intervention examiner's comment, which

stated that Claimant's inability to complete numerous testing tasks may have been due to lack of experience, was incongrous with the finding of a "marked" limitation. (Tr. 14.) The ALJ built a "logical bridge" from the evidence to her conclusion.

The ALJ's decision was not without error. The ALJ miscategorized Claimaint's proper age group at time of filing, as Claimant was an older infant/toddler at time of filing and a preschool child at the time of the hearing. 20 C.F.R. § 416.926a(g)(2). However, this Court is convinced that no reasonable ALJ would reach a different decision on remand to consider the improper age categorization. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010), *McKinzey v. Astrue*, 641 F.23d 884, 892 (7th Cir. 2011).

The ALJ's failure to specify the "whole child" approach or cite SSR 09-1p through 09-8p was not inherently material error. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (stating the key inquiry is whether the requisite analysis was followed, not whether the SSR was cited). Although the ALJ did specifically mention the 37% delay finding in the analysis for domain two, "attending and completing tasks," she discussed the entirety of her conclusions in detail before proceeding to analyze the individual domains; at no point did she identify a singular domain into which developmental delays would fit. Further, SSRs 09-1p through 09-8p did not develop an entirely original analytical framework, but rather explained and expanded upon the method of analysis previously performed. *See* 20 C.F.R. § 416.926a(c); *see also* SSR 09-1p (stating that the SSA has "long called" this method of analysis the "whole child" approach). Thus, the ALJ analyzed Claimant's impairments and limitations in a manner consistent with the "whole child" approach and she did not materially err in this regard.

The ALJ did not require the testimony of a medical expert at Claimant's hearing, but this decision does not constitute reversible error. Administrative law judges are responsible for making findings of fact based on the evidence. 20 C.F.R. § 404.1527(f)(2). The regulations

11

specifically provide that an ALJ "may" ask for and consider opinions from other medical experts, but do not require it. 20 C.F.R. § 404.1527(f)(2)(iii). Claimant's primary challenge to the ALJ's decision is based on the finding that Claimant's developmental delays did not result in a "marked" limitation in one of the first five domains. As detailed above, more than five sources analyzed Claimant's developmental delays and commented on their severity, and the numerous emergency room and doctor visits provide a significant number of medical opinions on the Claimant's condition. The evidence in the record was sufficient for the ALJ to find the Claimant not disabled, and the ALJ did not abuse her discretion in deciding not to call a medical expert or psychologist at the hearing. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

"Substantial evidence" in the record supports the ALJ's decision, and she built a "logical bridge" from the evidence to her conclusion.

## VII. Conclusion

In light of the foregoing reasons, Claimant's motion for summary judgment is denied and Commissioner's motion for summary judgment is granted.

ENTER:

**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE: August 4, 2011**

12